**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **LORI J. BARTEK,** | ) | **CASE NO. 4:05CV3096** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM** |
| **vs.** | ) | **AND ORDER** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. The Court has carefully considered the record and the parties' briefs (Filing Nos. 9, 13, and 15).

**PROCEDURAL BACKGROUND**

The Plaintiff, Lori J. Bartek, filed an application for disability benefits on May 13, 2002. (Tr. 88-90). On June 15, 2004, the administrative law judge, Robert K. Rogers, (hereafter the "ALJ") issued a decision finding that Bartek was not under a "disability" as defined in the Act. (Tr. 17-28). The Social Security Administration's Appeals Council denied Bartek's request for review. (Tr. 8-11). Bartek now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1).

Bartek claims that the ALJ's decision was not supported by substantial evidence. Bartek claims that the ALJ failed properly to determine Bartek's residual functional capacity ("RFC") by ignoring some of the limitations identified in the functional capacities evaluations and addendum prepared by Sharon Quest and by posing an improper

hypothetical question to the vocational expert ("VE").  Thus, a primary issue is whether the functional capacities evaluation prepared by Quest were properly considered and whether they establish by substantial evidence that Bartek was unable to lean and reach forward. Bartek contends that Quest's functional capacities evaluations establish that Bartek was unable to lean and reach, but that all the jobs identified by the vocational expert as jobs that Bartek could perform would require the worker to be able to lean and reach.  The Commissioner contends that there is no proof that Bartek was unable to lean and reach. Upon careful review of the record, the parties' briefs, and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

In 1998, Daniel Ripa, M.D., determined that Bartek had central cervical disc herniations at C5-C6 and at C6-C7.  He performed a cervical decompression and fusion in November 1998.  In March 1999, Bartek was released to return to work with significant restrictions that precluded her from performing her past work as a printer, but she was able to return to work as a training coordinator for her employer.  (Tr. 333).  She was followed post-operatively by her primary physician, Peter M. Morin, M.D. (Tr. 398-437).

Vocational rehabilitation was recommended (Tr. 333), and on June 29, 1999, occupational therapist Sharon Quest performed a functional capacities evaluation on Bartek.  (Tr. 220-25).  Following the evaluation, Quest determined that Bartek:

- could lift 40 pounds occasionally and 10 pounds frequently, from floor to shelf height;
- could carry 50 pounds occasionally when the weight was retrieved and placed above floor level, but that she should be limited to carrying 25 pounds occasionally;

- should avoid stooping and overhead reach tasks;
- could perform kneeling, squatting, and forward reaching as tolerated;
- could complete tasks requiring forward reach as tolerated;
- could perform repetitive fingering and handling tasks as tolerated.

(Tr. 225).  Quest also found that, though she had not been specifically tested for it, Bartek demonstrated the ability to sit for 30 minutes during the evaluation, to stand for significant lengths of time, and she had no difficulty walking on a treadmill for 10 minutes.  (Tr. 222). Quest observed Bartek for nearly 3 hours.  (Tr. 328).

Dr. Ripa reviewed Quest's findings and stated that believed they were accurate with regard to her work restrictions, and in September 1999, Dr. Ripa characterized the findings on the evaluation as "valid."  (Tr. 326-328).  At that time, Dr. Ripa stated that he believed Bartek would be able to perform her "regular work activities with the exception of lifting mailbags."  (Tr. 327).

Because Bartek had continuing complaints of pain, she was referred to the Mayo Clinic in January 2000.  After a series of diagnostic and evaluative tests, including an EMG, MRI, and nerve conduction studies, were performed and returned within normal limits or with negative findings, no conclusive diagnosis could be provided by the Mayo Clinic physicians.  (Tr. 195-206, and see 290, 383).

Quest performed a second functional capacities evaluation of Bartek on February 8, 2000.  (Tr. 212-18).  Quest concluded that Bartek's functional capacities with regard to lifting and carrying were somewhat changed from the previous evaluation.  In the February report, Quest concluded that Bartek could lift 30 pounds occasionally, (which was down from 40 pounds in September 1999), and Quest concluded that Bartek could carry only 40 pounds occasionally when retrieved and placed above floor level, (which was down from

3

50 pounds in September 1999), adding that in order to maintain safe body mechanics, the weight Bartek carries should be limited to 25 to 30 pounds.  Quest's other findings were consistent with Bartek's September 1999 evaluation, including that Bartek could perform tasks "requiring forward reach against no resistance as tolerated."  (Tr. 215-19). This final recommendation relating to forward reaching was the subject of a subsequent clarification issued by Quest.  In the clarification dated January 21, 2003, Quest explained:

> This means tasks involving no appreciable resistance such as those performed during the test, which included turning dials, flipping toggle switches, and pushing buttons.  Other common examples of "no resistance" tasks are paper handling, buttoning clothing, and handwriting.
> "As tolerated" means that since Ms. Bartek completed this task at an above competitive rate and that there was no objective evidence of any limitation; therefore she can perform this task as she wishes.

(Tr. 461).

In September and October 2000, Bartek was evaluated by Kathryn Hajj, M.D., a psychiatrist, who recommended some non-narcotic treatment for chronic pain syndrome. Dr. Hajj encouraged Bartek to begin aquatic therapy, which she attempted without benefit (Tr. 280-84), to engage in daily stretching, and to consider trigger point injections. (Tr. 305 -14).  In March 2001, Bartek returned to Dr. Hajj, who recommended Botox injections, which it appears she tried in the Spring of 2001.  (Tr. 399).

Bartek has been examined by two neurologists, Dr. Lew Birkmann in September 2000 and Dr. Rajeev Kumar in December 2000.  Dr. Birkmann noted nerve conduction and EMG testing performed in later 1999 were "entirely negative."  (Tr. 264).  Dr. Kumar could not provide a clear diagnosis, though he considered cervical dystonia, but he noted that the findings on examination and her tenderness to palpation, which were viewed by him

as out of proportion to her degree of abnormal posturing, were inconsistent with a cervical dystonia diagnosis.  He recommended Botox injections for her symptoms, which included muscle spasms.  (Tr. 285-87).

On October 9, 2000, Bartek was re-examined her primary physician, Peter M. Morin, M.D., who stated that he believed Bartek was not ready to return to work, and he expressly excluded her from light duty work.  He noted that Bartek continued to complain of neck, chest, shoulder and arm pain, which is worse on the left side.  (Tr. 413).

In November 2000, Bartek returned to surgeon Dr. Ripa who reviewed an MRI of the cervical spine.  He noted that it did not show evidence of cord compression, disc extrusion, or foraminal narrowing. (Tr. 320).  A year later, Dr. Ripa examined Bartek again, and found on examination that she had minimal restriction of flexibility in the back, negative straight leg raising, and no evidence of pathologic reflexes in the lower extremities.  (Tr. 319-20).  After this examination, Dr. Ripa diagnosed cervical dystonia, mild adhesive capsulitis in the left shoulder, and diffuse numbness of an unclear etiology ( *Id.*)

Also in November 2001, Dr. Morin corresponded with Plaintiff's attorney to inform him that Bartek continued to experience pain with any overhead lifting and lifting of more than 10 pounds.  Dr. Morin stated that he had seen Bartek active in youth athletics coaching and she continued to function well in a domestic fashion. (Tr. 400).

Other physicians have examined Bartek including Steven Saathoff, M.D., in August 2002. On examination, Dr. Saathoff found tenderness of neck musculature and that upper and lower strength, sensation, and deep tendon reflexes were within normal ranges.  He also noted that her strength was measured at 5/5, and symmetrical.  Bartek was examined by rheumatologist Steven J. Wees, M.D., in December 2002.  Dr. Wees was consulted to

5

ruled out fibromyalgia and "rheumatologic conditions," which he did. He found that she had no muscle atrophy or spasm and there was no evidence of neurological dysfunction. He also agreed that Bartek had magnified her symptoms.

Bartek was also under the care of rehabilitative and physical therapist, Ron Hruska in October and November 2000. Hruska stated that he could not help her and referred her to the Colorado neurologic clinic where she was examined by Dr. Kumar. I note that there were inconsistencies between Hruska's own records with regard to the amount of weight Bartek could safely lift, and that he noted it would be very difficult to perform a functional capacities evaluation on her.

Bartek's testimony at the administrative hearing on May 11, 2004, included that she was injured at work in July 1998, had the cervical fusion in November, 1999, and that in August 2000, her condition had worsened. In May 2004, Bartek complained of pain in the hands, neck, back, feet and headaches. (Tr. 486-90). She explained that she has been unable to work because she is unable to sit and unable to concentrate. Her neck pain and headaches prevent her from using a computer. She is able to do her household chores, including vacuuming, sweeping, cooking, and grocery shopping, but she needed to alternate these activities with rest. (Tr. 473-91).

**Vocational Expert's Testimony**

Testimony was taken from a vocational expert ("VE"), William Tucker. (Tr. 491-94.) When the ALJ posed his hypothetical employing the limitations the ALJ found credible, the VE identified three examples of jobs available in the national economy that a person could perform that required a medium exertion level as defined in the regulations, including jobs as a dining room attendant, a hand packer, and an industrial cleaner. (Tr. 491). When the

6

VE was cross-examined and asked to assume the additional limitations of being unable to reach forward and lift against resistance, he stated that the three jobs he had identified would be excluded from jobs that could be performed because all require the person to be able to lean and reach forward.  (Tr. 493).

### ALJ Findings

The ALJ found that Bartek has not performed any substantial gainful work activity since September 18, 1999.  (Tr. 27).  The ALJ found that Bartek had severe neck pain, chronic pain syndrome, and left shoulder adhesive capsulitis, and was status post cervical diskectomy in 1998.  (Tr. 27).  The ALJ concluded that Bartek does not have an impairment or a combination of impairments listed in or equal to one in Appendix 1, Subpart P. Regulations No. 4.  The ALJ determined that she could not perform her past relevant work as a printer, but that she retained the residual functional capacity to perform other work in the national economy, including industrial cleaner, hand packager, and dining room attendant.

In evaluating her functional capacity, the ALJ also considered Bartek's testimony concerning her pain levels, and found that she was not fully credible for the reasons set forth in the decision, including that she testified that she can perform many household chores with rest, she has been observed being active in youth coaching activities, she has been able to perform internet research, and she is not taking any prescription medications for pain.  The ALJ also noted that there were references in the medical records regarding symptom magnification.  Based on this evidence, the ALJ determined that while Bartek had some pain and limitation, her allegation that she was unable to perform all regular, sustained work activity was not credible.

The ALJ determined that Bartek has the residual functional capacity to:

lift 40 pounds occasionally and 10 pounds frequently, and carry 50 pounds occasionally and 25 pounds frequently. She has no impairment -based limits on her ability to sit, stand or walk. She can push and pull commensurate with the levels at which she can lift and carry. She cannot work overhead. She cannot perform work that requires frequent, extended or radical movements of her head and neck.

(Tr. 27). With this capacity, the ALJ determined that she is unable to perform her past relevant work, but that she is able to make a successful vocational adjustment to work which exists in signification numbers in the national economy, including work as an industrial cleaner, hand packager, and dining room attendant. (Tr. 28). The ALJ specifically addressed the cross-examination of the vocational expert conducted by Bartek's attorney, but the ALJ concluded that the facts presented during the cross examination were not supported by the record. Based on all evidence, the ALJ determined that Bartek is not disabled under the Act.

In his analysis, the ALJ also carefully considered the medical records and opinions submitted by numerous treating physicians, consulting physicians, specialists, physical therapists, and the psychiatrist. (Tr. 17-28).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994).  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B).

9

**SEQUENTIAL EVALUATION**

In determining disability, the Act follows a sequential evaluation process.  *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work.  *Id.*  If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability.  *Id.*

In this case, the ALJ completed all five steps in the evaluation process.  Bartek takes exception only with the ALJ's treatment of step five.  Specifically, she contests that the ALJ's determination that she possesses the residual functional capacity to engage in work that exists in the local economy.

**RESIDUAL FUNCTIONAL CAPACITY**

Residual functional capacity ("RFC") is defined as what the claimant "can still do despite . . . limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).  RFC is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations.  *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c).  *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000).

In addition to Bartek's testimony and evidence of third parties, the ALJ considered medical evidence in determining Bartek's functional capacity, including reports of treating and consultative physicians, Sharon Quest's functional capacity evaluations from

10

September 1999 and February 2000, the opinions of Ron Hruska, and the testimony of the VE, William Tucker. The VE opined that Bartek has the RFC to perform jobs rated at a medium exertional level that exist in significant numbers in the local economy.

***Credibility Determination.***

Bartek's argument is that the ALJ improperly determined her residual functional capacity (RFC) by providing the VE with a defective hypothetical question that failed to properly set forth all of Bartek's limitations. It is well established that a hypothetical question need only include those impairments and limitations found credible by the ALJ. *See Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005)*, Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004). Thus, directly tied to Bartek's argument is whether the ALJ properly discounted Bartek's credibility on the severity of her pain.

Before determining RFC, an ALJ first must evaluate the claimant's credibility. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *See Polaski,* 739 F.2d at 1322; *see also* § 404.1529. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski,* 739 F.2d at 1322. The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall,* 274 F.3d at 1218.

The credibility of Bartek's testimony is important because, in determining the fifth factor relating to a claimant's residual functional capacity to perform a range of work

activities in spite of her impairments, the ALJ must evaluate the credibility of a claimant's

testimony regarding subjective pain complaints.  *Black v. Apfel,* 143 F.3d 383, 386-87 (8th

Cir. 1998).  The ALJ is allowed to determine the "authenticity of a claimant's subjective pain

complaints."  *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing *Troupe v.*

*Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th

Cir. 1994)).  An "'ALJ may discount subjective complaints of pain if inconsistencies are

apparent in the evidence as a whole.'"  *Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir.

2001).   Also, an ALJ may resolve conflicts among various treating and examining

physicians, assigning weight to the opinions as appropriate.  *Pearsall v. Massanari,* 274

F.3d 1211, 1219 (8th Cir. 2001).

The *Polaski* standard is the guide for credibility determinations.  It provides, in

relevant part:

> The adjudicator may not disregard a claimant's subjective complaints solely
> because the objective medical evidence does not fully support them.  . . .
> The absence of an objective medical basis which supports the degree of
> severity of subjective complaints alleged is just one factor to be considered
> in evaluating the credibility of the testimony and complaints. The adjudicator
> must give full consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work record, and
> observations by third parties and treating and examining physicians relating
> to such matters as:
>> 1. the claimant's daily activities;
>> 2. the duration, frequency and intensity of the pain;
>> 3. precipitating and aggravating factors;
>> 4. dosage, effectiveness and side effects of medication;
>> 5. functional restrictions.
> The adjudicator is not free to accept or reject the claimant's subjective
> complaints *solely* on the basis of personal observations. Subjective

12

complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).  [1]

---

[1]        Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record.  Ruling 96-7p provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>
> * The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> * The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although each factor may not have been discussed).

The ALJ summarized Bartek's relevant testimony and described Bartek's daily activities according to her testimony and documentary evidence. In evaluating the credibility of Bartek's reports of pain, the ALJ relied on Bartek's own statements relating to her pain and the activities she can perform, description of her symptomology and findings on physical examination from physicians' and therapists' notes, references in the medical and therapy records indicating magnification of pain complaints and guarding that was not based on physical findings, negative test results, and that Bartek was not consistently taking prescription medication for the pain.

The record demonstrates that the ALJ performed a thorough *Polaski* analysis and considered the appropriate factors set forth in SSR 96-7p in determining that Bartek's subjective pain complaints were not fully credible. The ALJ's conclusion that Bartek's pain is not severe enough to prevent her from engaging in medium work with certain limitations is based on a thorough analysis of treating and consultative medical reports, and it is sufficiently-supported by substantial evidence. I conclude that the ALJ's decision to discount Bartek's testimony regarding the extent of her pain and limitations should not be disturbed.

**RFC was Based on Medical Evidence.**

Even if the ALJ properly evaluated Bartek's subjective complaints, Bartek contends

that the ALJ's residual functional capacity ("RFC") findings are not supported by substantial

evidence because the ALJ's decision was not based on medical evidence and did not take

into consideration all of the limitations identified by Sharon Quest.   Bartek argues that the

ALJ ignored medical opinions of her treating physicians and the opinions of rehabilitative

therapist Ron Hruska.   She also contends that the ALJ's reliance on Quest's

recommendations was inadequate, and that Quest's functional capacities evaluations

contained "other important and critical limitations and restriction that were ignored by the

. . . [ALJ] in making . . . findings and in stating the hypothetical question to the vocational

expert."  (Filing No. 13 at 2).

> The Court of Appeals for the Eighth Circuit has stated:

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional  capacity is a medical question," *Singh,* 222 F.3d at 451. "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

*Lauer v. Apfel*,  245 F.3d 700, 703-04 (8th Cir. 2001).

Bartek objects to the ALJ's decision to accord no weight to the opinions of treating

physicians Dr. Morin and Dr. Ripa relative to Bartek's inability to work.   "The [social

security] regulations provide that a treating physician's opinion  . . .  will be granted

'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir.2000) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered an opinion inconsistent with other evidence as a whole. *Id.* at 1013; *Holmstrom,* 270 F.3d at 720. "The ALJ's function is to resolve conflicts among 'the various treating and examining physicians.'" *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v. Shalala,* 52 F.3d 784, 785, 787 (8th Cir. 1985)). Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give "good reasons" for that weighting. *Holmstrom,* 270 F.3d at 720*; Prosch,* 201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2)).

I conclude that the ALJ provided good reasons for rejecting the functional limitation opinions provided in Dr. Ripa's and Dr. Morin's progress notes and reports. The ALJ determined that these limitations were not based on the physicians' physical examination of Bartek or on testing or on functional capacity evaluations. Rather, the ALJ determined that the functional limitations identified by Drs. Ripa and Morin, including that Bartek was unable to work, could only have been based on Bartek's own statements to them.

For similar reasons, the ALJ rejected the opinions of Ron Hruska, a rehabilitative physical therapist, finding that Hruska's opinions were not supported by any objective findings. I note that Hruska's opinions appear to be inconsistent in assessing the amount of weight that Bartek can lift, on one occasion stating the limit was 10 to 15 pounds, and on another occasion stating it was 6 to 8 pounds. In addition, Hruska observed that performing a functional capacities evaluation on Bartek would be difficult given her

16

guarding and pain behaviors.  He recommended a close study of her at a qualified pain clinic.

I find that the ALJ's RFC determination is supported by substantial evidence.  In discounting their functional limitation opinions of the treating physicians and Hruska, the ALJ made reference to the opinions and recommendations of occupational therapist Quest, who evaluated Bartek on two occasions about five months apart, and whose opinions the ALJ found were corroborated by negative results following EMG, MRI and nerve conduction tests and which had been validated by Dr. Ripa.  The ALJ had additional support for his determination in the negative and normal findings following EMG, MRI, X-ray, and nerve conduction studies that were performed in 1999, 2000, and 2001.  All these tests came back without any evidence of abnormality.  There is also support for the RFC determination in the physical examination notes of Dr. Ripa, Dr. Saathoff, and Dr. Wees.  The functional capacities evaluation by Quest in September 1999 and in February 2000 also lend evidentiary support to the ALJ's determination.

## *Question Posed to Vocational Expert*

A vocational expert's hypothetical questions are proper if they sufficiently set out all of the impairments accepted by the ALJ as true, and if the questions likewise exclude impairments that the ALJ has reasonably discredited.  *Pearsall,* 274 F.3d at 1220. The ALJ asked the VE:

Q:    Assume a hypothetical person with the same age and education as the Claimant.   Further assume the person can lift 40 pounds occasionally and 10 pounds frequently.  She can carry 50 pounds occasionally and 25 pounds frequently.  She has no impairment-based limits on her ability to sit, stand, or walk.  She can push and pull [inaudible] at which she can lift and carry. She cannot work overhead. She cannot perform work that requires frequent or radical movements of the head and neck.  I'm going to change that . . . that . . . requires frequent extended or radical movements of her head and

neck.  Could such a person perform the past relevant work of the Claimant as she performed it or as it is performed in the national economy?
        A.     I think not.  I think the work issue described that it involved frequent movement, extended movement of the neck and head.  So I think she probably could not do her previous work.
        Q:     Now assume a hypothetical person with the same age, education, and work experience as the Claimant.  And further assume that the person has the same functional limits as set forth in the prior hypothetical.  Are there any other jobs in the national economy that person could perform.
        A.     Yes.

(Tr. 492).  Then the VE gave three examples of work that he believed she could perform:

an industrial cleaner, a hand packer, and a dining room attendant.  All the work has a

weight exertional limit of medium and an SVP of 2.  The VE testified that these jobs are

available in abundance nationally. (Tr. 492-93.)

Bartek argues that the ALJ's use of Quest's evaluations was incomplete because

the ALJ failed to include all of the recommendations articulated by Quest in the

hypothetical questions to the VE.   The ALJ was under no duty to do so.  The ALJ's

hypothetical asked the VE to assume all the limitations that the ALJ included in the residual

functional capacity determination:  "has retained residual functional capacity to lift 40

pounds occasionally and 10 pounds frequently, and carry 50 pounds occasionally and 25

pounds frequently.  She has no impairment-based limits on her ability to sit, stand or walk.

She can push and pull commensurate with the levels at which she can lift and carry.  She

cannot work overhead.  She cannot perform work that requires frequent extended or

radical movements of her head and neck."  (Tr. 492; 21-22).   While the hypothetical did

not include the "as tolerated" qualification placed on certain activities from which Bartek is

not otherwise limited, I conclude that these activities are generally allowed and did not

need to be included as limitations in the ALJ's hypothetical to the VE.

18

Bartek also contends that additional limitations found in correspondence from Sharon Quest dated January 21, 2003, should have been included, but were not included, in the hypothetical question posed to the VE.  (Tr. 461).  However, I do not read Quest's correspondence as providing additional limitations but only as providing clarification of the fifth-listed recommendation in the report of February 8, 2000.  This clarification is not contrary to the ALJ's determination.

Bartek also argues that when the VE was asked to include in the hypothetical certain limitations, including that the person could not "bend or lean forward and reach", the VE stated that the person could no longer perform the three jobs previously identified by him.  I find that the attempt to cross-examine on the "bending" issues, which is arguably included in the recommendation to limit stooping to avoid headaches, was not properly asked of the VE during cross-examination, and does not constitute a basis for disturbing the ALJ's determination.  I also conclude that the "lean forward and reach" limitation has not been shown to be a limitation possessed by Bartek.

Examining the hypothetical question posed by the ALJ to the VE in this case, I conclude that the questions properly included the impairments that the ALJ found to be credible and substantially supported by the record as a whole.

## Conclusion

I have considered the record, and I conclude that the ALJ's decision is supported by substantial evidence.  The ALJ carefully considered all the evidence, including the plaintiff's testimony, the medical evidence and therapy notes, and the functional capacity evaluations.  The ALJ provided a reasonable basis for evaluating Bartek's testimony as not fully credible and good reasons for discounting the functional limitation opinions of the

19

treating physicians and a therapist.  I conclude that the ALJ's opinion regarding Bartek's RFC is based on the substantial evidence and that the VE's testimony is based on appropriate facts found to be credible.  Accordingly, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 24th day of April, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge